## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**JANE DOE**
c/o Derek E. Jokelson, Esquire
Jokelson Law Group, P.C.
230 S. Broad Street, 10th Floor
Philadelphia, PA 19102

        *Plaintiff,*

   v.

**SAINT JOSEPH'S UNIVERSITY**,
5600 West City Ave
Philadelphia, PA 19131

    and

**TERRI ADAMS**
5600 West City Ave
Philadelphia, PA 19131

        *Defendant*s.

CIVIL ACTION

NO. 2015 – cv – _____

***JURY TRIAL DEMANDED***

## COMPLAINT

## INTRODUCTION

1.    This action is brought pursuant, *inter alia*, to Title IX of the Education Amendments of 1972

codified at 20 U.S.C. §1681 et seq ("**Title IX**"), and arises from a widespread and well

known culture of abusive and sexually charged hazing on the women's softball team at Saint

Joseph's University ("SJU" or the "University") which was known, encouraged and tolerated

by the team coach, Defendant Terri Adams, and others at the University. The indifference,

encouragement and toleration exhibited by the Defendants was the proximate cause of severe

sex-based harassment creating a hostile environment, assault, battery, negligent and intentional infliction of emotional distress and other tortious misconduct upon Plaintiff who was a member of the softball team. Defendants' unlawful conduct subjected Plaintiff to continued sexual and other harassment and a hostile environment and effectively denied her access to the educational benefits and opportunities on the basis of gender, all in violation of Title IX and other legal duties.

**JURISDICTION, VENUE & JURY TRIAL DEMAND**

2.     This Court's jurisdiction to adjudicate plaintiff's civil rights claims under Title IX is predicated, *inter alia*, upon 28 U.S. C. §§ 1331 and 1343.

3.     Plaintiff invokes the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367 as they arise out of a common nucleus of operative facts.

4.     Plaintiff invokes the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332 as Plaintiff is domiciled in a state other than Pennsylvania and Defendants are both domiciled in and residents of Pennsylvania.  The amount in controversy is in excess of $150,000, exclusive of interest and costs.

5.     Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) because the Defendants reside or maintain their principal place of business in the District, and because all claims accrued within the District.

6.     Plaintiff demands a jury trial.

**PARTIES**

7.     Plaintiff Jane Doe is a 20 year old female college athlete who is a United States citizen

       domiciled in a state other than the Commonwealth of Pennsylvania.

8.     Defendant Saint Joseph's University ("SJU") is a private Catholic University which is

       located in Pennsylvania and organized under the laws of Pennsylvania.

9.     Defendant Terri Adams ("Coach Adams") is a citizen and resident of the Commonwealth of

       Pennsylvania and an employee of SJU employed as the head coach of the women's softball

       team.


**FACTUAL BACKGROUND**


10.    At all material times, SJU was receiving federal funding, as contemplated by Title IX, 20

       U.S.C. § 1681, et seq.

11.    SJU implemented and executed policies and customs in regard to the events that resulted in

       the deprivation of Plaintiff's constitutional, statutory and common law rights.

12.    The University is responsible for ensuring that all of its employees are properly trained and

       supervised to perform their jobs.

13.    The University is responsible for the acts and omissions of an employee when the employee

       is acting within the scope, course, and authority of his or her employment, and on behalf of

       their employer.

14.    At times relevant herein, upon information and belief, SJU's employees identified in this

       Complaint were acting in the course and scope of their authority at SJU and on behalf of SJU

3

(as well as for their own benefit and on their own behalf).

15.     Upon information and belief, prior to Plaintiff's matriculating at SJU, there was a widespread culture of harassment on the women's softball team including sexual conduct creating a hostile environment which was known to SJU and not properly addressed or remedied by SJU in violation of Title IX.  It is believed that this misconduct was consistent with the misconduct described below.

16.     In July 2011, while Plaintiff was between her sophomore and junior years of highschool, she competed in a tournament at which time she was scouted by multiple coaches of the SJU softball team including head coach Defendant Terri Adams who solicited and invited Plaintiff and her parents to visit SJU. While at SJU, Plaintiff and her parents met with Assistant Coach Ron Shoemaker and Head Coach Terri Adams.  Plaintiff was given a tour of the campus and facilities.

17.     During this visit, Coach Shoemaker and Coach Adams also met in the athletics office with Plaintiff and her parents. While in the office, the coaches explained that the SJU softball program was different from other college softball programs because it was family oriented. Coach Shoemaker drew a pyramid diagram on the board to illustrate the values of the softball program showing that family comes first, then school and then softball.

18.     Plaintiff was told words to the effect that SJU was committed to the Catholic Jesuit tradition and sought to empower students by instilling Christian values including social justice, appreciation of diversity, tolerance and that the softball team operated consistent with these values.  SJU's values communicated to Plaintiff were consistent with the University Mission Statement described more fully below.

4

19.   Plaintiff was also informed words to the effect that the softball team was a wholesome well functioning team.

20.   Coach Shoemaker and Coach Adams told Plaintiff that SJU takes care of their softball players especially those that are far from home and Coach Adams stated that she treats the players as if they were her own children.  The coaches explained that if any girls on the softball team were having difficulty, the coaches and SJU support staff would always be there and if there were ever a family emergency, that they would put the player on the plane and even travel with them so that they aren't alone.  The Coaches further promoted SJU by speaking very highly about the school and the softball program, the values of the school and the softball program and the abundance of safety nets in place for the student athletes to excel in school, explaining that if an athlete were having difficulties of any kind, they will have every resource of SJU available to them.

21.   At the conclusion of this tour Defendants solicited Plaintiff to attend SJU based upon the strength and values of their softball program stating that they wanted Plaintiff to consider attending SJU on a full athletic scholarship.

22.   After Plaintiff returned home with her parents, Coach Adams frequently communicated with Plaintiff by calling, texting, emailing and attending games played by Plaintiff.  During these communications, Coach Adams continued to tout the SJU softball program and the values of SJU including that it was a wholesome environment where Plaintiff would be looked after, safe and secure.

23.   In the late Summer of 2011, Coach Adams had a telephone conference with Plaintiff and her parents again offering a full athletic scholarship stating that everything except airfare to and

5

from school would be paid for, including a fifth year of college if necessary.  Coach Adams promised that Plaintiff would receive a top rated education on a Division I softball team and that Plaintiff would be well taken care of such that she would be safe, secure, have an emotionally stable and supportive environment with the full resources of SJU at her disposal. Plaintiff's parents asked Coach Adams repeated questions as to whether the scholarship would change in the event of injury, coaches leaving, performance issues, etc., and Coach Adams assured them that regardless of anything that could happen that SJU was and is an institution that sticks to it's word and that a scholarship would never be taken away from Plaintiff.

24.   Based upon these and other representations, Plaintiff committed to SJU in the late Summer or Fall of 2011 (i.e. at or just before the start of her junior year of highschool) thereby accepting the scholarship offer.

25.   In the Fall of 2011, Plaintiff and her family again visited SJU.  During that visit, Plaintiff and her family met with Dominick J. DiJulia, Vice President and Athletic Director of SJU.  Mr. DiJulia reaffirmed to Plaintiff and her family that SJU and its softball team was a wonderful family orientated environment where the well being of the players was a top priority.

26.   During that visit, Plaintiff and her family met with Kenneth W. Krimmel, Assistant Director of Academic Services for Student-Athletes, Compliance, Office of Athletics at SJU. Mr. Krimmel explained, amongst other things, the variety of safety nets in place for the athletes. He explained the educational program and its interaction with the athletics program.  He touted the value of an SJU diploma and again assured Plaintiff and her family that Plaintiff would have a number of resources at her fingertips to help her throughout her four or five

years at SJU in an effort to once again assure Plaintiff and her family that SJU and its softball

team was a wholesome environment where Plaintiff would be looked after, safe and secure.

27.     Thereafter, Coach Adams continued to frequently communicate with Plaintiff. During these

communications, Coach Adams continued to tout the SJU softball program and the values

of SJU, including that it was a wholesome environment where Plaintiff would be looked

after, safe and secure and that Plaintiff would have a wonderful experience at SJU.

28.     At no time prior to accepting the softball scholarship or matriculating to SJU did SJU explain

to Plaintiff that there was actually an existing widespread culture of harassment on the

women's softball team, including sexual conduct creating a hostile environment.  Had

plaintiff known this, she would not have attended SJU.

29.     As set forth more fully below, SJU's pre-matriculation representations to Plaintiff set forth

above were false and known to be false by the Defendants.

30.     Plaintiff matriculated at SJU in Philadelphia in the fall of 2013.  She was provided with a

copy of the Adult Student Handbook 2013-2014 attached hereto as Exhibit A (the "**Student**

**Handbook**"

31.     The Student Handbook sets forth SJU's Mission Statement which included the following:

> Saint Joseph's University is a Catholic and Jesuit university that
> instills in each member of its academic community: a love of
> learning and of the highest intellectual and professional
> achievement; moral discernment reflecting Christian values; and a
> transforming commitment to social justice. Saint Joseph's is a
> private Independent and Comprehensive university.
>
> The defining element of Saint Joseph's intellectual tradition
> experienced by all of its undergraduate students is its strong and
> integrative core curriculum in the liberal arts that informs their
> study of particular disciplines. While remaining true to that humane

7

and formative tradition, Saint Joseph's now embraces the challenge of excellence in graduate education in both the arts and sciences and in business. Our understanding of the centuries-old Jesuit educational vision of "concern for the individual student" (cura personalis) establishes effective and rigorous teaching and learning as a primary value. Since teaching and learning in the modern academic context require research at both the undergraduate and graduate level, the University cultivates, in students and faculty, generative scholarship that embodies free and open inquiry, and provokes imaginative thinking, aesthetic appreciation, and precise communication. As a necessary complement to intellectual achievement, we seek to illuminate the affective and ethical dimension in learning within the various disciplines at every level. Cura personalis also calls for the fullest development of the individual student's potential both inside and outside the classroom.

The Catholic character of Saint Joseph's University springs from its historical relationship with the Roman Catholic Church, and from its current embodiment of the great traditions of Catholic life and culture. For this University, Christ and the Church are sources of truth, guides and inspirations for life. Catholic values are normative, including: full respect for the freedom of conscience of each person, freedom in research and teaching according to one's discipline, and the continuous pursuit of truth, human rights, and the common good. We foster a lived awareness of the challenging and mutually enriching interaction between Christian faith and diverse contemporary culture; we seek to engage the full participation of the entire community in the University's intellectual, cultural, and spiritual life. The University's Ignatian identity derives from its founding by the Society of Jesus in 1851 and from the subsequent shaping of the University's development by the evolving world view of the Society. In ways consistent with its nature as a university, Saint Joseph's espouses the educational priorities of the Society of Jesus which include: searching for God in all things, pursuit of the greater good, the service of faith together with the promotion of justice, and effective compassion for the poor and those in need.

For the University's defining institutional ideals to matter at the regional, the national, or the international level, they need to be realized and expressed within an inclusive environment marked by

trust and enriched by a diversity of ideas, cultures, and religious commitments. The contemporary Ignatian vision of educating "men and women for others" assumes a Saint Joseph's University community-students, staff, and faculty that exists as a vital cultural plurality, aware of and committed to its central identity, while yet open and welcoming to all.

The University's Ignatian identity derives from its founding by the Society of Jesus in 1851 and from the subsequent shaping of the University's development by the evolving world view of the Society. In ways consistent with its nature as a university, Saint Joseph's espouses the educational priorities of the Society of Jesus which include: searching for God in all things, pursuit of the greater good, the service of faith together with the promotion of justice, and effective compassion for the poor and those in need.

For the University's defining institutional ideals to matter at the regional, the national, or the international level, they need to be realized and expressed within an inclusive environment marked by trust and enriched by a diversity of ideas, cultures, and religious commitments. The contemporary Ignatian vision of educating "men and women for others" assumes a Saint Joseph's University community-students, staff, and faculty that exists as a vital cultural plurality, aware of and committed to its central identity, while yet open and welcoming to all.

*Id.* at 7 – 8.

32.     The Student Handbook also had other sections pertinent to this litigation including the

following:

> TITLE IX COORDINATOR
> Title IX prohibits discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Saint Joseph's University is required to uphold Title IX in all educational programs. If the institution knows or reasonably should know about harassment (including sexual violence) that creates a hostile environment, Title IX requires immediate action to: eliminate the harassment; prevent its recurrence and address its effects.

*Id.* at 22.

UNIVERSITY POLICIES, REGULATIONS, & GUIDELINES
… To support the continuation of a positive, safe and educational
setting, the University has adopted an array of policies and
regulations. Should any member of the University community
violate established policy, the University has in place processes
intended to educate which includes in some instances the need to
discipline the violator, and thus deter further violations by that
and/or other individuals. This handbook includes most policies in
full, as well as some excerpts from more lengthy policies. …

*Id.* at 23.

33.   One policy described in the Student Handbook was the Community Standards Policy which

stated in part as follows:

**COMMUNITY STANDARDS**
Approved by University Council: April, 2008; Revised July 2010,
July 2011, July 2012, August 2013

The Mission Statement of Saint Joseph's University shapes the
responsibilities and privileges afforded to members of the
University community. These Community Standards are designed
to foster a community conducive to achieving the mission of the
University. Rooted in the Catholic Jesuit tradition, Saint Joseph's
University aims to create and to sustain an educational
environment that facilitates students' academic, personal, and
spiritual development. At the core of these values is the Ignatian
tradition of "cura personalis," which affirms the goodness, the
worth and the dignity of every human being. Students affirm this
commitment through adherence to the standards of conduct
established within our community.
                                        * * *
**What Conduct Would Violate the Community Standards?**
Any behavior that violates standards set forth in the Student
Handbook, the University Catalog, approved organizational
constitutions and by-laws, room/board contracts and other
University bulletins, as well as behavior that fails to meet the four
University Expectations outlined above may violate the Community
Standards. Specifically, any student or student organization alleged
to have committed or alleged to have attempted to commit any of
the following acts is subject to the Community Standards process

10

outlined in this document.

This is not an all-inclusive list.

1. Physically abusing or threatening another person, or engaging in any other conduct that threatens or endangers the health or safety of another person.

2. Engaging in sexual violence. This includes dating violence, domestic violence, and stalking (see Sexual Violence Policy).

3. Hazing (see Policy on Hazing).

5. Violating the alcohol policy (see Alcohol Policy).

8. Discriminating, harassing, or retaliating against another person (see Policy Prohibiting Discrimination, Harassment and Retaliation).

9. Bullying another person (see Bullying Policy).

13. Engaging in lewd, obscene, or indecent behavior, including making lewd, obscene, or indecent gestures.

14. Violating the sexual activity policy (see Sexual Activity Policy).

16. Making, distributing, or publishing a media recording of any person without that person's consent and/or prior knowledge (e.g., audio, picture, video).

26. Violating any federal, state, or local law or any University policy, rule, or regulation.

*Id.* at 23 – 26.

For Title IX violations, the University will take specific steps to prevent reoccurrences of any harassment and to correct discriminatory effects on the complainant and others, if appropriate.

*Id.* at 36.

34.    Another policy described in the Student Handbook was the Alcohol Policy which stated

11

in part as follows:

> ALCOHOL POLICY
> Saint Joseph's policy on the use of alcohol combines observance of state law, protection of the overall community and reduction of high risk behavior by students. Consistent with our Catholic, Jesuit mission, the alcohol policy is guided by the care and concern for the individual person and the welfare of other students. It should be understood that the University in no way is a co-sponsor to off campus alcoholic events unless it has specifically stated this prior to the event. To reflect its commitment to alcohol awareness, the University calls upon key individuals and departments to educate the University community on the dangers of alcohol abuse and to enforce policies on alcohol use

*Id.* at 46

> Examples of alcohol violations include, but are not limited to:
>
> 1. underage possession and/or consumption of alcohol;
>
> 2. knowingly furnishing, transporting, and/or allowing minors to consume alcohol;
>
> 3. use of alcohol resulting in involuntary, erratic and/or abusive behavior;
>
> 5. involvement in the high risk use of alcohol;
>
> 6. exceptional number of persons observed in a residence on campus or off campus when an open container of alcohol is present;
>
> 7. open container of alcohol in public area.
>
> Students are expected to immediately report conduct or activity which poses a danger to the community or its members.
>
> For example, all students are expected to seek appropriate assistance for themselves or others in situations where help is needed to ensure proper care of a person who is significantly

intoxicated or under the influence of drugs. Students should not hesitate to seek help because of fear of disciplinary action.

In most circumstances, the help seeker and the student in need will not be charged with a policy violation under the University Community Standards system. Although students may be required to meet with a University official regarding the incident, Saint Joseph's University will support and encourage this behavior by treating it as a health and safety matter, not as a disciplinary incident. **In rare circumstances, such as cases of repeated, flagrant, or serious violations of the Community Standards (e.g., bodily harm, sexual violence, physical or verbal abuse or harassment, distribution of drugs, hazing, theft) or violations that caused the harm to another person requiring emergency response, a student's behavior may be considered more than a health and safety matter**.

*Id.* at 47 (emphasis supplied).

35.   Another policy described in the Student Handbook was the Bullying Policy which stated

in part as follows:

BULLYING POLICY
Bullying behavior creates feelings of defenselessness, fear, and injustice and undermines a person's dignity. The University strictly prohibits bullying. Bullying is severe, pervasive, or persistent actions of a person (or group of persons) directed towards another person or group of persons in a severe, pervasive, or persistent manner, which are intended to hurt, intimidate, degrade, humiliate, and/or undermine. Bullying is also engaging in any course of conduct that is likely to seriously annoy or alarm another person (or group of persons) in a severe, pervasive, or persistent manner. Bullying can take many forms, including, but not limited to, verbal (teasing, threatening, name-calling), social (spreading rumors, intentionally isolating), and physical (hitting, punching, shoving). Bullying can be in person, through actions, and/or through electronic communication. Bullying creates a risk to the health or safety of the University community. Anyone found to engage in bullying behavior may be subject to disciplinary action.

*Id.* at 48 – 49.

13

36.     Another policy described in the Student Handbook was the Policy Prohibiting

Discrimination, Harassment and Retaliation which stated in part as follows:

PROHIBITING   DISCRIMINATION,   HARASSMENT   AND
RETALIATION

**I. Preface**

In keeping with Saint Joseph's University's ("Saint Joseph's" or
"University") mission as a Catholic, Jesuit University and a formal
and informal community of faith, we must hold ourselves to a high
standard of respect and fairness in our personal conduct and
interactions. As such a community, we espouse that each
individual is entitled to certain basic protections. These protections
include, but are not limited to:

- Freedom from unlawful discrimination, harassment,
  and retaliation of any type.

- Freedom to be heard without fear of reprisal.

- The expectation of confidentiality to the extent that
  is possible.

- The assurance of a prompt and equitable
  investigation and resolution of all allegations of
  discrimination, harassment or retaliation.

- During a formal process, the opportunity of the
  respondent to be presented with all relevant
  information in a timely manner, and to respond.

At the same time, the University is committed to the principles of
academic freedom. Vigorous discussion and debate, even of
controversial matters, are an integral part of the educational
enterprise.

**II. Purpose**

As a Catholic, Jesuit University, Saint Joseph's is committed to
the just and respectful treatment of students, faculty, and staff.
To this end, Saint Joseph's prohibits unlawful discrimination
against, and harassment of, its employees, students, or applicants

14

for employment or admission on the basis of any characteristic protected by state or federal law. The prohibition extends to discrimination, harassment and retaliation by third parties visiting campus or participating in University-sponsored activities (including volunteers; visitors; trustees; and, independent contractors).

The University's Policy Prohibiting Discrimination, Harassment and Retaliation ("Policy") is designed to educate members of the University community about discrimination, harassment and retaliation and provide clear procedures when a violation of this Policy occurs. It is the University's hope that through continued education, and appropriate action upon receipt of reports and complaints of conduct that may be a violation of the Policy, the University can eliminate discrimination, harassment and retaliation within the Saint Joseph's community.

### III. Definitions

A. **Protected Categories**: The law prohibits discrimination and harassment on the basis of sex/gender, race, age of 40 or over, color, religion, national origin, ethnic origin, sexual orientation, disability, marital status, and military and military veteran status.

B. **Discrimination**: Unlawful discrimination occurs when an individual is treated less favorably because he or she is a member of a protected category. Discrimination adversely affects a person's employment or education; it includes the denial of academic or employment opportunities, and differentiates in terms and conditions of employment on the basis of membership in a protected class.

C. **Harassment**: Harassment means any unwelcomed, unsolicited and offensive conduct that tends to injure, degrade, disgrace or show hostility toward a person because of his or her membership in a class of persons protected by law. For purposes of applying this policy, "sexual" harassment includes conduct that is of a sexual nature or related to a person's gender and may include persons of the same sex. Harassment of any kind need not be intentional to be prohibited under this policy. Harassment on the basis of one's sexual orientation can also constitute discrimination on the basis of sex. For an incident to constitute harassment, it

must be offensive to a reasonable person. Sexual violence constitutes a form of sexual harassment.

D. **Sexual Violence**: Sexual violence, including but not limited to physical forms of sexual assault (e.g., rape, sexual assault, sexual battery, and sexual coercion), is an especially serious form of both discrimination and harassment. As such, special procedures for complaint, investigation and resolution apply. See Policy on Sexual Violence.

E. **Retaliation**: Adverse action taken against a person because of his or her participation in a discrimination or harassment proceeding (e.g., as complainant or as witness).

F. **Examples of Conduct That Can Constitute Discrimination or Harassment**

1. Examples of unacceptably discriminatory conduct include decisions based on stereotypes or assumptions about the abilities, traits, or performance of individuals because of his or her membership in a category protected by law.

2. Conduct that can constitute harassment includes, but is not limited to:

(a.) Epithets, slurs, negative stereotyping, or threatening, intimidating or hostile acts that relate to the Protected Categories listed in Section A above;

(b.) Placing on walls, bulletin boards, email, or elsewhere on the University's premises graphic material that shows hostility or aversion to an individual or group that relate to the Protected Categories listed in Section A above);

(c.) Sexually explicit, graphic, abusive, degrading, intimidating, or offensive jokes, comments, remarks or gestures;

(d.) Sexual advances, propositions, flirtations, requests or pressure of any kind for sexual favors;

16

(e.) Physical contact or intimidation.

**IV. Processing Discrimination, Harassment and Retaliation Reports and Complaints**

**A. General Provisions**

\* \* \*

2. **Reports and complaints of discrimination and harassment should be made as soon as possible after the incident(s) occurs. All reports and complaints will be investigated promptly and appropriate action will be taken as expeditiously as possible under the circumstances presented**. The University will respect the privacy of the complainant, the respondent, and the witnesses, if any, in a manner consistent with the University's obligations (legal or under this Policy) to investigate the matter, protect the individuals involved, take appropriate remedial action, and comply with any discovery or disclosure obligations required by law. This means that, although confidentiality will be respected, it cannot be guaranteed.

3. **The University may investigate a report or complaint of discrimination or harassment regardless of whether the complaining party desires the University to pursue the report or complaint, if the University has cause to believe that the action reported or complained of constitutes a violation of this Policy, breach of applicable law or a threat to the University community**.

4. **All** students and **employees should report any discrimination or harassment, experienced by themselves or another, to the appropriate University officer: Title IX Coordinator or EEO/AA Officer (see Section B below). No student or employee should assume that the University already knows about a particular situation or event**.

5. **Retaliation: The University prohibits retaliation against any individual who complains of a violation of this Policy or assists in providing information about a complaint of discrimination**, including complaints of sexual, racial or other unlawful harassment.

17

*Id.* at 63 – 66 (emphasis supplied).

37.     Another policy described in the Student Handbook was the Policy on Hazing which stated

in part as follows:

> POLICY ON HAZING
> Hazing is defined as "any action or situation created intentionally, whether on or off campus premises, to produce mental or physical discomfort, embarrassment, harassment, or ridicule." Saint Joseph's University prohibits all forms of hazing. The Anti-Hazing Law of Pennsylvania states that any person who causes or participates in hazing commits a misdemeanor of the third degree. It also includes the willful destruction or removal of public or private property in its definition of hazing. Individuals found responsible of hazing may be fined, placed on probation, suspended or dismissed. Likewise, organizations, clubs and teams may be fined, placed on probation or disbanded. Other sanctions also may be appropriately issued. Aside from the legal aspect of hazing, the University believes that hazing is contrary to the Christian teaching of human dignity and contradicts an environment of friendship, maturity and charity within its collegiate community.

*Id.* at 79 – 80.

38.     Another policy described in the Student Handbook was the Sexual Violence Policy which

stated in part as follows:

> SEXUAL VIOLENCE POLICY
>
> **A. Purpose**
>                     * * *
> Saint Joseph's University ("Saint Joseph's" or "University") is committed to providing an institutional environment where all persons may pursue their studies, careers, duties, and activities in an atmosphere free of threat of sexual violence. Sexual harassment of students, employees and any member of Saint Joseph's University community interferes with the expectation that students and employees will learn and work in an environment that is free from discrimination. Sexual violence, as defined by the University, may also constitute a crime.

18

**B. Policy**

The University does not tolerate Sexual Violence on its campus, at University-sponsored events, or off-campus, by any member of the Saint Joseph's community (faculty, students, administrators, staff including union members, and volunteers). Conduct that is determined to constitute Sexual Violence is not only a violation of the Policy and reprehensible in any context, but it is also a matter of particular concern in an academic community in which students, faculty, staff, volunteers and visitors are connected by strong bonds of dependence and trust. As such, all members of the community are expected to report acts of Sexual Violence.

In addition to University action, a member of the Saint Joseph's community who has violated this Policy (the respondent) may be prosecuted under applicable criminal statutes of the location where the alleged offense occurred. S/he will be subject to internal University investigative and/or disciplinary proceedings regardless and independent of any criminal process.

\* \* \*

**C. Sexual Violence**

The Office for Civil Rights (OCR) states that Sexual Violence includes rape, sexual assault, sexual battery, and sexual coercion (Ali, Dear Colleague Letter, 2011, pp. 1-2).

- Sexual intercourse without consent is rape.
- Sexual contact without consent is sexual assault.
- The touching of a person in an intimate part of the body without consent is sexual battery.
- Subjecting a person to sexual contact as a result of the use of physical or psychological pressure or threats, or the consumption of alcohol or drugs without consent is sexual coercion.

\* \* \*

**D. University Response When There is a Report of a Sexual Violence**

The goal of the University's response is to offer support services to the complainant and respondent(s), while seeking to provide a safe educational and working environment. To this end, the University will take steps to prevent Sexual Violence from occurring through prevention and education. However, when such

conduct occurs, the University will take all necessary and reasonable steps to stop the alleged conduct and provide support to the complainant, the respondent, and, as necessary, to other members of the University community, at the time the assault is reported, during the investigation process and afterward.

*Id.* at 85 – 88.

39.   After arriving on campus as a freshman, Plaintiff was informed by upperclass members of the softball team that there was an annual initiation and hazing of new freshman softball players.

40.   In or about the fall of 2013, Plaintiff was subjected to the initiation and hazing on the softball team in a week long hazing ritual (which upon information and belief had been repeated over the course of many years with the knowledge of employees of SJU including its softball coaching staff).

41.   At the commencement of this initiation week, upperclass members of the team delivered letters to each freshman filled with inappropriate sexually charged harassment and designed to terrorize and intimidate the new members of the team explaining they were "scum" and "low level swine" who must endure the coming harassment in order to be considered actual members of the team as follows:

**([Name of upperclass team member 1 redacted])**: Freshmeat, you may have thought that you were a part of this team from the moment you walked onto the field. THAT IS NOT TRUE!! You are scum, low level swine, who only got a glimpse of this team from the outside. This is your deliverance week, a time to realize your place, the lowest rung on the totem pole! Remember that and **never forget it.** This week is time to show respect to your upperclassmen. You are not on this team just yet. You must make it through this week in order to fully understand the bond we have as teammates. I licked [Head Coach] Terri's FUPA [Fat Upper Pussy Area]!!

20

**([Name of upperclass team member 2 redacted])**: This week will not be easy. There are rules and regulations you must follow. If they are not followed there will be dire consequences. This letter is yours as a group. It is to be shared but never lost! Someone must have it with them at all times. If you so not, the entire class suffers. I am turned on by [Assistant Coach] Brooke [Darreff]'s sexy chicken legs!

**([Name of upperclass team member 3 redacted])**: Some general rules that must be followed by all...never allow anyone in an authoritative position in the university of your friends know what you are doing or why you are doing it. This is between the softball team and the softball team only!! If you break this trust you will suffer the worst of all consequences. [Head Coach] Terri has sexy facial hair!

**([Name of upperclass team member 4 redacted])**: At the end of the week you will be rewarded according to your cooperation and participation during the week. As a class you are expected to create an original dance to song "Wannabe" by the Spice Girls!! You have a lot to live up to; expectations are very high so you better practice. You will perform this dance on Friday night as a group, in full costume. I love doing DROM [Dynamic Range of Motion exercises] naked!

**([Name of upperclass team member 5 redacted])**: Each of you is going to show us your true self this week based off of your Spice Hawk Identity. It is your job to figure out which spice you are; Sporty Puritan Hawk, Posh Clueless Hawk, Ginger "___" Hawk, Baby Chatterbox Hawk, and Scary Frisky Hawk. Your costumes for Friday must be **CREATIVE** and reflect the spice hawk each of you represent! Lick a Dick!

**([Name of upperclass team member 6 redacted])**: You are NOT ALLOWED to use ANY form of social media (including Instagram, Twitter, or Facebook), WE WILL BE WATCHING! In addition to the rules in your personal letters that you will be receiving, as a group you are expected to have dinner together every night. You will sit together and no one else will sit with you and you WILL be checked on by an upperclassman. I'm an ass clown!!!

**([Name of upperclass team member 7 redacted])**: You are expected to be in your personal dorm room every night of the week by 8:00pm. There are activities every night of the week so plan accordingly. You will received a phone call from an upperclassman with that night's activities! You must get ALL of your study hall hours done for the week and get your homework done early! I like to twist titties!

**([Name of upperclass team member 8 redacted])**: You are to dress according to what your upperclassmen specify, in your separate letters, but you are NOT to show up to any softball related event in the required attire, so make sure you have a change of clothing on you at all times. I get moist at the sight of [assistant Coach] Gary [Falasca]'s mustache!

**([Name of upperclass team member 9 redacted])**: There will be NO DRINKING or GOING out this week. You will be very busy and we want to make sure you're well rested for what we have in store. Make sure you take care of all your other responsibilities, school, softball, family, so that you can enjoy everything this week has to offer. Any mishaps will be documented and used against you on a further date. I queef during squats!

42.   During the week long hazing period in the fall of 2013, Plaintiff was forced to undergo hazing in violation of numerous SJU policies including those described above. The conduct directed at Plaintiff included the following:

a.   Being forced to clean the off campus house of upperclass members of the softball team;

b.   Being forced to hold a plank position in the middle of Church Road with traffic;

c.   Being forced to dress up as a male rapper, squat on top of another freshman and simulate sexual intercourse in front of the entire team;

d.   Being forced to drink alcohol, including Jell-O shots, despite the fact that she was on medication and after informing the upperclassmen that she did not want to drink

alcohol while on mediation because it was unsafe;

e.    Being forced in a group setting to place condoms on one or more bananas placed
between her legs in the groin area;

f.    Being locked in a car until she drank a baby bottle of liquid comprised of various
items from the kitchen cabinets, such as ketchup, mustard, hot sauce, etc.;

g.    Being forced to read a letter in front of the team declaring her worthlessness;

h.    Being instructed not to look directly at upperclassmen from the softball team she
encountered on campus;

i.    When encountering any upperclassmen on the softball team, she was required to refer
to them by designated nicknames and perform an act specific to each upperclassman.
One particularly degrading act that Plaintiff recalls involved calling an
upperclassman named by the nickname "Jersey Gem" and performing a sexually
lewd dance referred to as a "Jersey Turnpike" in front of this upperclass member of
the team. The term "Jersey Turnpike" refers to a sexually lewd act involving bending
over 'doggie style' in front of another person and simulating intercourse;

j.    Being forced to ask and answer sexual questions and tell sexual stories. Plaintiff
recalls being asked about her sexual orientation, what sexual positions she likes, what
sexual acts she had performed, to identify persons with whom she's been sexually
intimate and being asked questions about pornography;

k.    Being belittled and demeaned by upperclass members of the softball team in a private
and a group setting;

l.    Being locked in a pitch black room with extremely loud music being played at the off

23

campus house of upperclass members of the softball team; and

m.   Being forced to dance to a compilation of music by the artist known as Lady Gaga which dance was recorded by teammates and posted on Snap Chat without Plaintiff's permission.

43.   During this initiation week in the Fall of 2013, Plaintiff refused to engage in certain other activities but was forced to witness her fellow freshman teammates engage in these activities including:

a.   Being forced to simulate oral sex on wine bottles while video taped;

b.   Being forced to simulate manual sex over their clothes; and

c.   Being forced to pretend they were coach Terri Adams and simulate an orgasm.

44.   Upon information and belief, during this initiation week in the Fall of 2013, one of the incoming freshman became so drunk at an initiation week party that she required emergency room treatment for alcohol poisoning.   Upon information and belief, Coach Adams accompanied this other teammate to the hospital and was aware of the multiple violations of SJU policies at that time but failed to properly further report the incident within SJU and/or failed to properly act to protect teammates, including Plaintiff, from further violations of policy and law.

45.   In the middle of this initiation week in the Fall of 2013, the entire team was told to report to the off campus house of upperclass members of the softball team where the freshman were informed that Coach Terri Adams had emailed or texted seniors on the team to tell the seniors that the "Administration" had found out about the initiation and hazing and that the initiation and hazing was suspended.

46.     Upon information and belief, Kenneth W. Krimmel, Assistant Director of Academic Services for Student-Athletes, Compliance, Office of Athletics at SJU was aware of the hazing and misconduct on the softball team in 2013 and likely before 2013.

47.     Upon information and belief, despite the fact that Coach Adams and the SJU Administration were aware of the initiation and hazing occurring on the softball team, no formal investigation took place in 2013 – 2014 (or before that time) with regard to any violations of SJU policy, including the Community Standards Policy, Alcohol Policy, Policy Prohibiting Discrimination, Harassment and Retaliation; Bullying Policy; Hazing Policy or Sexual Violence Policy.

48.     Upon information and belief, had a proper response been made with a proper investigation in years prior to the 2013 – 2014 school year, Plaintiff would not have been subjected to the hazing and misconduct described in this Complaint.

49.     Upon information and belief, had a proper response been made with a proper investigation in the Fall of 2013 during the initiation and hazing week, Plaintiff would not have been subjected to any further hazing and misconduct as described in this Complaint.

50.     Following the initiation week in the Fall of 2013, Plaintiff continued to be victimized, harassed, demeaned and belittled by her team, often in front of Coach Adams.

51.     Instead of discharging her duties as an employee of SJU and reporting the hazing and misconduct, Coach Adams never put a stop to such misconduct and instead endorsed it by allowing it continue and actively engaged in such misconduct herself.  For instance, during Plaintiff's freshman year and thereafter, Coach Adams started calling Plaintiff "Sippy" and/or "Sippy Shit in Pants" explaining that Plaintiff was worthless and was no better than

"shit in pants."  Coach Adams called Plaintiff these demeaning and derogatory names in

front of other members of the softball team, thereby humiliating, harassing and bullying

Plaintiff.

52.     In addition to Coach Adam's demeaning nick name, upperclass teammates called Plaintiff

demeaning and often sexual nicknames, including "Chaftey," "Chafer," "Chafty First,"

"Queeffer" and "Queeffing Thighs."  Plaintiff understood and was told that the "Chafer"

related nick names apparently have to do with skin chaffing in the groin/inner-thigh area.

53.     Plaintiff was consistently called these nick names by her teammates in Coach Adams's

presence without any intervention by Coach Adams.

54.     In addition, Plaintiff is and was constantly berated about her sexual orientation by other

teammates who told her that she was gay and she should come out of the closet and other

language to that effect.  Moreover, other teammates who befriended Plaintiff were called

lesbians for associating with Plaintiff.

55.     The foregoing conduct continued and worsened throughout Plaintiff's freshman year.  She

felt helpless, defenseless, worthless, demeaned, and victimized.  Her mental health began to

suffer and she was unable to appropriately focus upon her academic work resulting in her

grades suffering. These injuries continued until Plaintiff was forced to leave SJU in 2015 as

set forth more fully below.

56.     During the 2013 – 2014 school year, another underaged player on the team would frequently

arrive at practice in a taxicab drunk.  This misconduct was known to the coaching staff and

tolerated.

57.     During Spring Break of her freshman year in 2014, a graduate assistant coach made reference

to Plaintiff to some of the misconduct during initiation week which confirmed Plaintiff's knowledge and belief that the coaches knew about the initiation misconduct and never addressed the situation.

58.     In the Fall of 2014 (Plaintiff's sophomore year) during the initiation and hazing of the new freshman softball teammates (which Plaintiff was forced to watch), Plaintiff and the other sophomores were informed by upperclass members of the softball team that their initiation and hazing was picking up where it left off from their freshman year as the prior year's initiation had been interrupted. In this regard:

    a.     Plaintiff was forced to participate in the remainder of the initiation.

    b.     Plaintiff was given the nick name "Dirty Sanchez."  According to Wikipedia, "Dirty Sanchez is sexual slang for a purported sex act where feces is purposely smeared onto a partner's upper lip . . . the term evokes the stereo typical mustache of a Mexican."  Plaintiff is of Hispanic decent.

    c.     The upperclass members of the team forced a freshman to perform a "lap dance" on Plaintiff involved simulating sexual intercourse while seated on Plaintiff's lap.

59.     Once again, after the continued hazing and initiation misconduct in Plaintiff's sophomore year, the misconduct of Coach Adams and the teammates as described at length above continued unabated throughout the sophomore year.

60.     Plaintiff was often reduced to tears and began having suicidal thoughts.

61.     Plaintiff frequently called her mother at times uncontrollably crying stating that she felt like an outcast and that her teammates had turned their backs on her. Plaintiff's mother became scared for Plaintiff's mental state.

62.   Plaintiff's mother spoke with Coach Adams in or about January 2015 in a lengthy meeting lasting 2 to 3 hours or more. Coach Adams told Plaintiff's mother words to the effect that Coach Adams would look out for misconduct and that things would get better.  However, Coach Adams did nothing and the situation only continued to worsen.

63.   By the Spring of 2015, the situation at SJU was completely intolerable to Plaintiff who was having increased depression and suicidal thoughts.

64.   In the Spring of 2015, there began to be news reports of the hazing and misconduct on the softball team.  Teammates and coaches assumed Plaintiff was the source of these reports and Plaintiff began to be retaliated against by members of the team who made threatening comments to her, including threats that members of the team would rip her head off and shove a softball down her throat.

65.   Upon information and belief, during the course of the investigation, Coach Adams actively impeded the investigation by informing the players on the team to "plead the fifth while being investigated" and that "this kind of drama happened last year and nothing will happen," or words to that effect.

66.   Upon information and belief, Assistant Coach Gary Falasca also told team members that the media had found out about the hazing because their "parents had big mouths and need to learn to keep their fucking mouths shut" or words to that effect.

67.   During the course of the investigation, one of the upperclass softball players wrote an open letter of apology to the SJU community at large and admitted that the initiation week described above was a long standing tradition of the SJU softball team enacted her freshman year (2012-2013) and which she understood at the time had been enacted in previous years.

28

By way of example, this upperclass member of the team also admitted that the harassing initiation letter described above had been handed down for many years amongst upperclass softball team members for use in the hazing during initiation week:

> Lastly, the letter given to the freshmen. Nobody on this team wrote that letter, it has been passed down for years (I have no idea how many). One of the traditions was to pass on that letter to each freshmen class. Yes, that letter has some mean things in it that people could have taken the wrong way ...

68.     Plaintiff has been forced to withdraw from SJU and her softball scholarship at SJU.

69.     Prior to the spring of 2015, and while Plaintiff was being victimized by her teammates and the Defendants' misconduct, Defendants failed to provide Plaintiff with the academic, athletic, mental health and other supportive services which they had claimed were available and which they were responsible to provide.

70.     Prior to the spring of 2015, and while Plaintiff was being victimized by her teammates and the Defendants' misconduct, Defendants failed to intervene and instead condoned the misconduct which they knew of.

71.     Plaintiff has suffered harm including, but not limited to:

    a.      Mental and emotional harm including suicidal thoughts;

    b.      Fear for her safety;

    c.      Suffering the dehumanizing effects of this type of hazing and bullying including feelings of worthlessness and loss of a positive college experience;

    d.      Harm to her past academic performance and future academic capacity;

    e.      Feeling that she must leave St. Joseph's University for her physical and mental well being despite being on a full softball scholarship;

29

      f.      Having to quit the softball team;

      g.     An impaired softball career;

      h.     Having to leave SJU and now having to pursue her academic options elsewhere;

      i.      Denial of equal educational opportunities;

      j.      Denial of access to the full benefit and opportunity of her education at SJU.

72.    Plaintiff seeks all available compensatory and punitive damages.

73.    Plaintiff further seek attorneys fees and litigation costs including all fees and costs as may be allowed under 42 U.S.C. § 1988, 28 U.S.C. § 1920 and Federal Rule of Civil Procedure 54.

## COUNT I
## VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972

74.    The foregoing and subsequent paragraphs are incorporated by reference as though set forth at length.

75.    The Defendants' acts, omissions, policies and customs resulted in the sexual harassment, harassment, a hostile environment based upon sexual misconduct, assault, battery, intentional infliction of emotional distress and other misconduct upon Plaintiff. By way of example, SJU knew of and condoned a culture of pervasive sexual harassment on the women's softball team in violation of its own stated policies and which it knew to be harmful to its student athletes.

76.    Plaintiff was denied equal educational opportunities in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§1681-1688.

77.    Plaintiff was denied access to the full benefit and opportunity of her education at SJU in

violation of Title IX.

78.  By its actions and inactions before and after the misconduct described in the Complaint, Defendant SJU acted with deliberate indifference to the rights of Plaintiff and other female student athletes on the women's softball team to a safe and secure educational environment, thus materially impairing Plaintiff's ability to participate in and benefit from the activities of SJU, and denied them access to educational benefits and opportunities on the basis of gender, in violation of the requirements of Title IX.

79.  As a direct and proximate cause of Defendants' unlawful actions including violations of Title IX, Plaintiff is entitled her to actual and compensatory damages in an amount to be determined by a jury.

80.  SJU, through its employees and administrators including but not limited to the women's softball coaching staff, had actual knowledge of the discrimination and harassment being perpetrated upon members of the softball team and, at times, participated in such misconduct.

81.  SJU violated Title IX by, *inter alia*:

   a.  failing to take immediate and appropriate action over a course of years to investigate or otherwise determine what occurred with regard to known harassment and hazing on the women's softball team, or, being deliberately indifferent thereto;

   b.  failing to take prompt and effective steps to end the sexual violence, sexual harassment and other misconduct to prevent its recurrence, and address its effects;

   c.  failing to provide adequate academic assistive services, health, psychological, counseling and other services to Plaintiff and other members of the women's softball team immediately after learning of misconduct on the softball of a sexual nature

resulting in a hostile environment; or, alternatively, being deliberately indifferent thereto;

d.      failing to discipline employees who knew of the misconduct described in this Complaint but turned a blind eye to such misconduct;

e.      failing to discipline employees who knew of the misconduct described in this Complaint and participated in such misconduct;

f.      allowing Plaintiff access to education and activities to be restricted through sexual harassment and discrimination, or, alternatively, being deliberately indifferent thereto;

g.      effectively denying Plaintiff an opportunity to continue to attend SJU based on the discrimination and harassment she endured at SJU creating a hostile environment making continuing her education at SJU untenable; and

h.      through other actions, inactions, and deliberate indifference.

82.      The actions of the Defendants described herein were willful, deliberate, and malicious, thereby entitling Plaintiff to an award of punitive damages in an amount to be determined by a jury.

## COUNT II
## RETALIATION UNDER TITLE IX OF THE EDUCATION AMENDMENTS OF 1972

83.      The foregoing and subsequent paragraphs are incorporated by reference as though set forth at length.

84.      Title IX prohibits an educational institution from retaliating against an individual or individual(s) because they have complained about sex discrimination under Title IX. *See*

32

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005).

85.    SJU retaliated against Plaintiff for engaging in protected activities, namely, for raising awareness of the culture of sexual harassment through hazing experienced by them and other students at SJU.

86.    SJU, by and through its coaching staff, intimidated and threatened Plaintiff on account of her having exercised her rights under Title IX by attempting to raise awareness of the sexually based harassment and willfully ignored complaints of sexual harassment as a punishment to Plaintiff and similarly situated student athletes.

87.    Plaintiff is each entitled to recover damages from Defendants proximately resulting from their acts of retaliation including compensatory damages.

## COUNT III
## NEGLIGENCE

88.    The foregoing and subsequent paragraphs are incorporated by reference as though set forth at length.

89.    Defendants each owed duties to Plaintiff and breached those duties resulting in harm to Plaintiff.

90.    Defendants failed to inform plaintiff of the actual culture of the SJU softball team during the recruiting process and misled Plaintiff by giving her false assurances and false information which Plaintiff relied upon to her detriment.

91.    Defendants failed to train and supervise their subordinates to properly perform their job responsibilities.

92.    Once Plaintiff matriculated at SJU, Defendants further breached their duties by failing to act

33

appropriately under the circumstances as described in this complaint.

93.   Plaintiff suffered damages as a result of Defendants' negligence.


**COUNT IV**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

94.   The foregoing and subsequent paragraphs are incorporated by reference as though set forth at length.

95.   Defendants' misconduct in this case is so outrageous in character and so extreme in degree that it is beyond all possible bounds of decency, and should be regarded as atrocious, and utterly intolerable in civilized society.

96.   Plaintiff suffered emotional distress as a direct and proximate result of the Defendants' misconduct.

97.   Plaintiff was injured by Defendants' misconduct as aforesaid.


**COUNT V**
**BREACH OF CONTRACT**

98.   The foregoing and subsequent paragraphs are incorporated by reference as though set forth at length.

99.   Defendants formed a contract with Plaintiff as embodied in the Student Handbook and the other policies and procedures of SJU as well as the oral promises used to induce Plaintiff to attend SJU.

100.   Defendants breached their contract with Plaintiff by failing to enforce their own policies, failing to investigate known or suspected (including repeated) violations of the policies and

failing to protect the welfare and well being of Plaintiff despite promises to do so.

101. Defendants' breaches of contract foreseeably caused Plaintiff harm including the emotional, psychological and physical harm alleged in this complaint.

## COUNT VI
## PROMISSORY ESTOPPEL

102. The foregoing and subsequent paragraphs are incorporated by reference as though set forth at length.

103. This count is pled in the alternative to the Breach of Contract Count.

104. SJU's promises and representations to Plaintiff were false and misleading and resulted in the damage to the Plaintiff as aforesaid.

105. Said promises and representations were material in that, *inter alia*, Plaintiff relied to her detriment upon same and established and accepted a scholarship and attended SJU in reliance upon same.

106. Plaintiff justifiably relied upon Defendants' promises to her detriment which caused her damages.

## COUNT VII
## Unfair Trade Practices and Consumer Protection Law ("UTPCPL")

### *Plaintiff v. SJU*

107. Plaintiff incorporates by reference the allegations all of the foregoing and subsequent paragraphs as though fully set forth at length herein.

108. SJU engaged in unfair methods of competition and/or unfair or deceptive acts or practices

in violation of the Unfair Trade Practices and Consumer Protection Law 73 Pa. C.S.A § 201-1 et seq. ("UTPCPL").

109.   The Unfair Trade Practices and Consumer Protection Law ("UTPCPL") was designed to promote full disclosure of information to consumers and to equalize market position and strength of the consumer *vis-a-vis* the seller.

110.   In that regard, the UTPCPL requires an expansive reading which reaches unfair and deceptive practices in all consumer transactions.

111.   SJU is a "person" as defined pursuant to 73 Pa. C.S.A. §201-2 and is engaged in trade or commerce as defined pursuant to 73 Pa. C. S. A §201-2.

112.   Plaintiff was a "purchaser" within the meaning of Section 201-9.2 of the UTPCPL.

113.   Defendants specifically intended Plaintiff to rely upon their words and conduct as set forth in this Complaint to recruit Plaintiff to SJU as a softball player and to have her remain at SJU.

114.   Plaintiff's reasonable reliance was specifically foreseeable.

115.   SJU's services were primarily for personal, family or household purposes of Plaintiff within the meaning the UTPCPL.

116.   SJU engaged in unfair and/or deceptive trade practices under the UTPCPL, including but not limited to:

   a.   Representing that the goods or services supplied by Defendants had characteristics, ingredients, uses and benefits that they did not have by, *inter alia*, representing that (1) SJU promoted Christian values and upheld the dignity of all attendees and (2) the softball team was a values oriented team where Plaintiff would be safe, secure and

36

looked after by the coaching staff; when it was known that harassment, intimidation, sexual abuse, and violations of many university policies were tolerated on the softball team, by the coaches of the softball team and by the administration; See 73 P.S. 201-2(4)(v);

b.      Representing that services supplied were of a particular standard, quality or grade when they were of another as set forth above. See 73 P.S. 201-2(4)(vii);

c.      Advertising goods or services with intent not to sell them as advertised. See 73 P.S. 201-2(4)(ix);

d.      Failing to comply with the terms of the written guarantee/warranties as stated in the Student Handbook.

e.      Engaging in fraudulent and/or deceptive conduct which created a likelihood of confusion or of misunderstanding as set forth herein including informing Plaintiff that the SJU softball team was a wholesome well functioning team when in fact it was not. See 73 P.S. 201-2(4)(xxi).

117.    Plaintiff was injured by Defendants' violations of the UTPCPL.


**RELIEF REQUESTED**:

**WHEREFORE**, Plaintiff requests the following equitable and legal relief:

a.      That the Court declare that Defendants' actions, policies, and practices complained of herein violated Plaintiff's rights under Title IX of the Education Amendments of 1972;

b.      Injunctive relief requiring Defendant SJU to take effective steps to prevent sex-based

37

discrimination, harassment and/or violence creating of a hostile environment in its education and athletic programs; fully investigate suspected incidents of such misconduct; appropriately respond to all such misconduct; and mitigate the effects of such misconduct by eliminating any hostile environment that may arise from or contribute to it.

c.      That Defendants be permanently enjoined from violating the rights of Plaintiff and others under Title IX of the Education Amendments of 1972;

d.      That special damages be awarded to compensate Plaintiff for economic injuries as a consequence of Defendants' violations of their rights in an amount to be determined by a jury;

e.      That compensatory damages be awarded against Defendants to compensate Plaintiff for her pain and suffering, mental and emotional distress, anxiety, humiliation, outrage, damage to reputation and payment of all expenses incurred by her or her family (on her behalf) in response to these circumstances;

f.      That punitive damages be awarded against Defendants in an amount to be determined by the enlightened conscience of the jury to deter Defendants from similar misconduct in the future;

g.      That a trial by jury be had on all issues wherein a jury trial is permitted under law;

h.      That attorneys' fees and expenses of litigation be awarded;

i.      That prejudgment and post-judgment interest be awarded; and,

j.      That the Court award such other equitable or monetary relief as deemed just and proper under the circumstances.

**JOKELSON LAW GROUP, P.C.**

_____/s/
By:  Derek E. Jokelson, Esquire
     David E. Jokelson, Esquire
     230 S. Broad Street, 10th Floor
     Philadelphia, Pa. 19102
     (215) 735-7556

     *Attorneys for Plaintiff*